FILED

2010 Mar-23  AM 09:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **RACHEL I. SIMS** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-08-S-1798-NW** |
| ) | |
| **THE TOWN OF ROGERSVILLE,** ) | |
| ***et al.,*** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rachel Sims, asserts claims under 42 U.S.C. § 1983 against the following defendants for "First Amendment Retaliation/ Free Speech" and "First Amendment Retaliation/ Freedom to Assemble": (1) The Town of Rogersville, Alabama; (2) Harold D. Chandler, in his individual capacity as the Mayor of Rogersville; (3) Jesse Gorrell, in his individual capacity as the Director of the Rogersville Senior Citizen Center; (4) the Town Council of Rogersville; (5) Richard Herston, in his individual capacity as a member of the Rogersville Town Council; (6) Doris Cosby, in her individual capacity as a member of the Rogersville Town Council; (7) Anita Roberson, in her individual capacity as a member of the Rogersville Town Council; (8) Richard Thrasher, in his individual capacity as a member of the Rogersville Town Council; and (9) Alan Puckett, in his individual

capacity as a member of the Rogersville Town Council.[1]  The case currently is before

the court on defendants' motion for summary judgment on both of plaintiff's claims.[2]

Upon consideration of the motion, the briefs, and the evidentiary submissions, the

court concludes the motion is due to be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should

be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In other

words, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment."  *Chapman

v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.

City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

[1]*See* doc. no. 22 (Amended Complaint).
[2]Doc. no. 45.

moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

The Uniform Initial Order states the following with regard to the manner of stating facts in summary judgment briefs:

### D.   Manner of Stating Facts

All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs.* Counsel must state facts in clear, unambiguous, simple, declarative sentences. All statements of fact must be supported by specific reference to evidentiary submissions.

. . . .

## 2.      Opposing Party's Statement of Facts

Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

### a.      Response to Movant's Statement

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

### b.      Additional Undisputed Facts

The second section may contain additional, allegedly undisputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The second section of the opposing party's statement of facts, if any, shall be clearly designated as such. The opposing party should include only facts which the opposing party contends are true and not in genuine dispute.

### c.      Additional Disputed Facts

The third section may contain additional, allegedly disputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The third section of the opposing party's statement of facts, if any, shall be clearly designated as such. Each statement of allegedly disputed facts must be

followed by specific reference to those portions of the evidentiary record which both support and contradict the alleged fact.

### 3.    Moving Party's Reply

The reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts.  The moving party's response to the non-moving party's additional claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the non-moving party's additional claimed undisputed facts.  Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based.  *All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*[3]

The parties apparently viewed these clear *requirements* as mere *options*.

Defendants followed the court's instructions in their initial brief in support of their motion for summary judgment, setting out each fact in a separately numbered paragraph and providing citations to the evidentiary record.[4]  Plaintiff also followed the court's directions when drafting her own statements of undisputed and disputed facts. In her response brief, however, plaintiff did not respond to any of defendants' allegedly undisputed facts.[5]   Accordingly, all facts proposed by defendants are deemed to be admitted for summary judgment purposes.  Furthermore, in their reply

---

[3]Doc. no. 23 (Uniform Initial Order), at 15-18 (emphasis in original) (footnote omitted).

[4]Doc. no. 44.

[5]*See* doc. no. 48.

brief, defendants did not respond, paragraph-by-paragraph, to plaintiff's proposed undisputed and disputed facts.[6]  Accordingly, all facts proposed by plaintiff also are deemed to be admitted for summary judgment purposes.  The court realizes, of course, that many of the facts asserted by plaintiff and defendants contradict each other.  Accordingly, the court will accept only those facts that are supported by the evidentiary record, and it will construe all discrepancies in the evidence in the light most favorable to plaintiff, the non-moving party.  Proceeding accordingly, the court finds the following facts.

Plaintiff, Rachel Ivadell Sims, is a resident of Rogersville, Alabama.[7]  Plaintiff was eighty-four years of age on the date of her May 7, 2009 deposition.[8]  She has been an active patron of the Town of Rogersville Senior Citizens Center (the "Center" or the "Senior Center") since 1982.[9]  Approximately seven years ago, plaintiff even served as Interim Director of the Center while the town searched for a new, permanent director.[10]  The purpose of the Senior Center is to provide local senior citizens with entertainment, socialization, and meals.[11]  The record is not entirely

---

[6]*See* doc. no. 50.

[7]Defendants' evidentiary submission, Tab A (Deposition of Rachel Sims), at 7.

[8]Sims Deposition, at 7.

[9]*Id.* at 10.

[10]*Id.* at 12-13.

[11]*Id.* at 14, 81.

clear as to the ownership, management, and source of funding for the Senior Center,

however.  Nevertheless, there is evidence that oversight for the Center was provided

by The Town of Rogersville and a private organization called NACOLG, which the

court assumes is an acronym standing for "Northwest Alabama Council of Local

Governments.[12]  In particular, the Town of Rogersville formed a Senior Citizens'

Committee to address issues concerning the Senior Center.  The Senior Citizens'

---

[12]*See* defendants' evidentiary submission, Tab B (Deposition of Sheila Long), at 10 ("Everything I did [at the Senior Center] I had to clear through the Town of Rogersville and NACOLG").  The record does not describe or define NACOLG, but an internet search reveals that NACOLG stands for the Northwest Alabama Council of Local Governments.  Northwest Alabama Council of Local Governments homepage, http://nacolg.com (last visited March 15, 2010).  The NACOLG website describes the organization's origin and function as follows:

> The Northwest Alabama Council of Local Governments (NACOLG), is the regional planning and intergovernmental coordination agency created by the local governments pursuant to Alabama State Legislation.

> It is a voluntary association of governmental units in the five county region of Colbert, Franklin, Lauderdale, Marion, and Winston Counties along with the municipalities therein.

> . . . .

> NACOLG is not a government but is an extension of city and county government through which officials get together to decide issues of region-wide importance and work together to solve problems that stretch beyond local government boundaries.

> All NACOLG policy decisions are made by local elected officials.  This insures all NACOLG programs and policies reflect the interest of the member governments.

*Id.*

Committee was composed of three members of the Rogersville Town Council.[13]

On January 11, 2008, Harold D. Chandler, the Mayor of Rogersville, sent plaintiff a letter on Town of Rogersville letterhead, stating the following:

Dear Ms. Sims:

I am writing to advise you that, due to a number of incidences [sic] involving you and the Rogersville Senior Citizens Center, it has been recommended by the Senior Citizens Center membership, the Senior Citizens Center Committee and the Town Council of the Town of Rogersville that you no longer be allowed to attend any functions at the Center. Therefore, I am prohibiting you from entering in or upon the premises and grounds of the Senior Citizens Center in Rogersville and from any further communications with the operating staff and/or members of the Senior Citizens Center by any means, including, but not limited to, personal confrontation, telephone, email and U.S. Mail. Any violation of this prohibition may result in legal action seeking to have this decision upheld in a Court of Law. I believe it to be in the best interest of the senior citizens who utilize the Center and the personnel who operate the Center, that you no longer be permitted to utilize the Center or to participate in the activities provided at the Center.

It is apparent that you are not pleased with the staff or with the functions that are being provided at the Center. Additionally, you have created an unpleasant atmosphere for those members who attempt to use the facility. The general consensus among the membership, the Committee and the Town Council is that the current management of the Center is doing an excellent job running the Center. While it is your right to opine about Senior Citizens Center operations, it is not your right to disturb and disrupt the peaceful use of the Center by the general membership.

I am sorry it has come to this, but it is clear that these actions are

---

[13]Long Deposition, at 10-11. *See also* defendants' evidentiary submission, Tab I (Deposition of Doris Goode Cosby), at 8-9.

necessary.  I hope that you will peacefully and promptly comply with my
directive in these matters.[14]

Mayor Chandler stated that he wrote this letter based upon recommendations from the
Senior Citizens Committee and the patrons of the Senior Center.[15]  The final decision
to terminate plaintiff's rights to visit the Center was made jointly by Mayor Chandler
and members of the Town Council, together with members of the Senior Citizens
Committee.[16]

Mr. Chandler testified in more detail during his deposition as to the reasons for
plaintiff's dismissal from the Senior Center.  According to Mayor Chandler, the
primary reason for plaintiff's dismissal was that she brought in jokes, pictures, emails,
and other computer printouts that were considered offensive, or even "obscene" by
other patrons of the Center and the Center staff.[17]  In fact, nineteen other patrons of
the Center signed an undated petition stating:  "We the undersigned were very much
offended by the pornography that Mrs. Sims brought into the center,"[18] and several
of the patrons had complained to the manager of the Center about the situation.[19]
Prior to January 11, 2008, Mayor Chandler had never received complaints about

---

[14]Sims Deposition, at Exhibit 18.

[15]Defendants' evidentiary submission, Tab D (Deposition of Harold Chandler), at 14.

[16]*Id.* at 29.

[17]*Id.* at 15, 20, 47, 49.

[18]Sims Deposition, at Exhibit 1.

[19]Long Deposition, at 34.

plaintiff bringing pornography or sexual jokes and pictures into the Senior Center.[20]
Even so, Jesse Gorrell, who managed the Center for approximately one year
beginning in August of 2007, had warned plaintiff "a couple of times" not to bring
any such material into the Center.[21]   Despite that verbal warning, no Town official
could point to any written rule or regulation prohibiting a patron from bringing sexual
jokes or pictures into the Senior Center.[22]

The Center maintained a file of the jokes, pictures, and emails plaintiff had
allegedly brought into the Center.[23]   Plaintiff acknowledges bringing some of these
documents into the Center, does not recall whether she brought others, and denies
bringing still others.  In any event, she denies passing any of the documents around
to others at the Center, and she denies reading any of the documents aloud.[24]   The
entire file of documents collected by the Senior Center staff is attached to this opinion
as Appendix I.  By way of example, some of the documents included jokes using the
four-letter "f-word" that rhymes with "duck," or otherwise referencing sexual activity,
pictures of elderly men with erections, or elderly women with sagging breasts, and

---

[20]Chandler Deposition, at 38-45.

[21]Defendants' evidentiary submission, Tab C (Deposition of Jesse Gorrell), at 27-28.

[22]Chandler Deposition, at 48-49; defendants' evidentiary submission, Tab F (Deposition of Larry Richard Thrasher), at 25-26.

[23]Chandler Deposition, at 38-39; Long Deposition, at 16-17, 34-37.

[24]*See* Sims Deposition, at 29-53.

one joke referencing a group of men "kicking the [excrement] out of" another man.[25]

Jesse Gorrell testified that he believed "some" of the jokes plaintiff brought into the Center were "pornography," and that they and were offensive to some of the other people at the Center.[26]  Harry Puckett, who was a member of the Rogersville Town Council and the Senior Citizens Committee on January 11, 2008, testified that "some people" found plaintiff's jokes offensive, and that he believed the jokes were "inappropriate for a public place."[27]  Anita Roberson, another member of the Senior Citizens Committee as of January 11, 2008, testified that she considered the material plaintiff brought into the Center to be "pornography," and she believed the material was "offensive to the people who were attending" the Center.[28] Richard Herston, who now is the Mayor of Rogersville, but who served on the Town Council and the Senior Citizens Committee on January 11, 2008, also referred to the material plaintiff brought into the Center as "pornography,"[29] and stated that if he brought the same materials to his job, he would be fired.[30]  Doris Cosby, another member of the Town Council and Senior Citizens Committee as of January 11, 2008, testified that the

---

[25]Sims Deposition, at Exhibits 2-17.

[26]Gorrell Deposition, at 27-32.

[27]Defendants' evidentiary submission, Tab E (Deposition of Harry Alan Puckett), at 21, 30.

[28]Defendants' evidentiary submission, Tab G (Deposition of Anita Roberson), at 11, 13, 27.

[29]Defendants' evidentiary submission, Tab H (Deposition of Richard Allen Herston), at 10, 13, 25-27.

[30]*Id.* at 25.

Senior Citizens Committee "sort of considered" the jokes plaintiff brought into the Center to be "pornographic."[31]

Mayor Chandler also testified that a "small" reason for banning plaintiff from the Senior Center was that she made continual complaints about the manner in which the facility was run.  Specifically, plaintiff disagreed with the management style of each Center director, and she complained about a prize she received for winning a Bingo game.[32]  Furthermore, Sheila Long, who was Manager of the Center for a two-year period beginning in 2005, testified that plaintiff engaged in other disruptive behavior, including throwing her keys, repeatedly telephoning other patrons of the facility to gossip about the Center's operations, accusing other patrons of stealing, refusing to abide by the Center's rules, "stalking" another patron, and bringing outside food into the Center despite being instructed not to do so.[33]  Jesse Gorrell testified that he and plaintiff had a disagreement over a prize plaintiff won during a Bingo game.  Mr. Gorrell began to feel threatened by plaintiff after an unidentified man told him:  "Jesse, Ms. Sims told me there is a person from Florida coming up here to take care of you."  That communication prompted Gorrell to have a police

---

[31]Cosby Deposition, at 19.

[32]Chandler Deposition, at 18-21.

[33]Long Deposition, at 30, 52, 59, 73, 75-78.

officer stationed outside his house for protection.[34]   Finally, plaintiff's daughter,

Blenda Fadell, confronted Ms. Long at the Senior Center about the problems plaintiff

had been having.   Ms. Fadell was very angry during the confrontation, and she

pointed her finger in Ms. Long's face.   Ms. Long could not recall the details of her

conversation with Ms. Fadell, but she felt sufficiently threatened by the confrontation

to call the Chief of Police afterward.[35]

Plaintiff apparently requested reconsideration of the decision to bar her from

the Center, although the court could not locate a written copy of any such request in

the record.   On January 30, 2008, Mayor Harold Chandler sent plaintiff a letter on

Town of Rogersville letterhead, stating:

Dear Ms. Sims:

At your request, the Rogersville Senior Citizens Committee
reconsidered its decision to prohibit you from attending the Rogersville
Senior Citizens Center.  The committee met on January 18, 2008 and
your request was fully addressed.

The committee has asked me to inform you that the decision, to
prohibit you from participating in the activities provided at the center,
on January 11, 2008, will stand.  This was a joint decision made by the
committee and membership of the Rogersville Senior Citizens Center.

If you have any questions or concerns about this prohibition,

---

[34]Gorrell Deposition, at 82.

[35]Long Deposition, at 54-55.

-13-

please contact the town's lawyer . . . .[36]

Plaintiff's daughters, Blenda Fadell and Wanda Mink, filed a grievance on

plaintiff's behalf on February 15, 2008.  The grievance was addressed to Jesse Gorrell

in his capacity as Director of the Senior Center, and it stated:

> Dear Mr. Gorrell:
>
> This letter is written on behalf of our mother, Rachel Ivadel Sims
> . . . .
>
> We are in receipt of letters from town hall informing our mother
> that she is no longer allowed to attend any functions there and
> "prohibiting her from entering in or upon the premises and grounds of
> the Senior Citizens Center in Rogersville."  Obviously, this letter was
> composed and sent based partially upon your recommendation to the
> mayor.
>
> Consequently as director, this grievance is directed to you, and we
> trust that your records are such that you will respond in a timely manner
> as stated in the grievance procedures from NACOLG.   First and
> foremost, we request the following:
>
> 1)    Your specific reason for determining that our mother
>        would be dismissed.
> 2)    Your documentation, which led up to this decision.
> 3)    Copies of any verbal, as well as written notice to her to
>        indicate that there would be procedures against her.
>        Obviously, sarcasm directed at her from you in front of the
>        membership, does not count.
> 4)    Documents signed by the "membership" requesting her
>        dismissal of the Center, dated, registered, etc.
>
> Our mother has done nothing but good works and deeds

---

[36]Chandler Deposition, at Exhibit 5.

throughout her life for the benefit of others.  We have the facts and documentation to prove this.  She also served as interim director of the center, appointed by the mayor, while he searched to fill this position. We would also like to see your credentials for running a Senior Center as director.

We look forward to hearing from you shortly.[37]

Director Gorrell responded on February 27, 2008, on Town of Rogersville letterhead,

stating:

This letter is in response to the "Grievance" filed in our office on February 27th, 2008.

1.    Ms. Sims was not content to simply participate in the scheduled activities, she was disruptive and interrupted activities on a number of occasions prior to the action that was taken.
2.    The documents we have on file are sensitive materials that are not appropriate for mailing.  If you want to come to the Town Hall in person and present a copy of the POA naming you as agent for your mother, you may obtain copies.
3.    The action taken was done properly by the personnel charged with the responsibility of running an orderly Senior Citizens Center.

My credentials as Director of the Senior Citizens Center are not at issue in this matter.  This action was not decided solely by me or solely on my recommendation, it was a joint decision of the Senior Citizens Center committee and the Mayor based on past disruptive conduct by Ms. Sims and was only initiated after much reflection and discussion.

If you believe this response does not resolve this matter to your

[37]Gorrell Deposition, at Exhibit 12 (emphasis in original).

satisfaction, you may, pursuant to the NACOLG Grievance Procedures, subparagraph 1, forward the grievance to the Program Director within NACOLG.[38]

Despite this denial, the Town of Rogersville and/or the Senior Citizens Committee eventually decided to allow plaintiff to return to the Center.[39]  The record does not contain a written record of this decision, or any evidence as to the date of the decision.[40]

In the meantime, plaintiff interpreted Mayor Chandler's January 11, 2008 letter to mean that she was not allowed to return to the Senior Center for *any* reason, including to vote in the upcoming election.   That perceived restriction was problematic for plaintiff, because the Senior Center was her designated polling place.[41]  In fact, Ty Burnett, the Rogersville Chief of Police, informed plaintiff that the text of the Mayor's letter meant that she should not go onto the Senior Center premises.[42] Consequently, plaintiff did not attempt to enter the Senior Center to cast her vote, even though no town official had specifically told her that she was not

---

[38]Gorrell Deposition, at Exhibit 13.

[39]*Id.* at 49-50; defendants' evidentiary submission, Tab H (Deposition of Richard Allen Herston), at 30.

[40]There is some suggestion in Jesse Gorrell's deposition that the decision to allow plaintiff to return to the Senior Center was made as the result of a grievance hearing held by NACOLG. However, the record does not contain actual testimony to that effect, only the statements of counsel during the deposition. *See* Gorrell Deposition, at 50-51.

[41]Sims Deposition, at 64-65.

[42]*Id.* at 58-59.

allowed on the premises for voting purposes.[43]

On February 4, 2008, the day of the primary election (also the first election that occurred after January 11, 2008), Mayor Harold Chandler sent yet plaintiff another letter on Town of Rogersville letterhead. The letter, which indicated that it had been hand delivered to plaintiff by the Rogersville Police, stated:

> Dear Ms. Sims:
>
> It has come to my attention that the letter you received from the Town has been interpreted to prevent you from entering the Senior Citizens Center for the purpose of casting your vote in upcoming elections. The circumstances that precipitated the letter had to do only with your involvement in the activities planned and conducted by the Senior Citizens organization.
>
> Your use of the Senior Center for purposes of voting has never been discussed. The Town of Rogersville cannot, nor would it ever, prevent you from entering any voting facility for the purpose of casting your vote in any election. You are welcome to enter into the Senior Citizens Center, if that is where you are to vote, for the purpose of voting. Entry for that purpose will not be interfered with by anyone associated with the Town, the Senior Citizens organization, or anyone else.[44]

Plaintiff acknowledges that the February 4th letter was left at her house, but she claims that she did not see the letter until the next day, February 5th, *after* the primary election.[45]

---

[43]*Id.* at 78.

[44]*Id.* at Exhibit 19.

[45]Sims Deposition, at 66-70.

Mayor Chandler sent a final letter to plaintiff on May 29, 2008.  The letter also was on Town of Rogersville letterhead, and it stated:

> Dear Ms. Sims:
>
> It appears that you are still under the impression that you are not allowed to enter the Senior Citizens Center for the purpose of voting. That is an incorrect understanding.  As I told you in my letter of February 4, 2008, you are welcome to enter into the Senior Citizens Center, if that is where you are to vote, for the purpose of voting.  I have informed the Secretary of State's office by letter, a copy of which is enclosed for your review, that you may enter the Senior Citizens Center to vote in the upcoming primary election on June 3, 2008 and all future elections.
>
> There will be no interference from the Town, its employees, the Senior Citizens organization, or anyone involved in the voting process at this election or any future local, state, or national elections.  I am, by this letter, confirming to you that you are not barred from the Senior Citizens Center for purposes of voting.  I reiterate that you have never been refused access to exercise your voting privileges in any past elections and will not be refused access for exercise of any future voting privileges.
>
> I hope this clears up any misconceptions you may have concerning your right to vote at the Rogersville Senior Citizens Center.[46]

Plaintiff did not miss voting in any subsequent elections.[47]

### III. DISCUSSION

In her amended complaint, plaintiff alleges that defendants retaliated against

---

[46]*Id.* at Exhibit 20.

[47]Sims Deposition, at 68-78.

her for the exercise of free speech when they expelled her from the Senior Citizens Center, and that those retaliatory actions deprived plaintiff of both her right to free speech and her right to freely assemble.[48]   A liberal reading of plaintiff's complaint also reveals an allegation that plaintiff was deprived of her right to vote as a result of defendants' retaliation.

All of the defendants argue that plaintiff has no evidence to support any claim under the First Amendment.  The individual defendants also argue that they are entitled to the protection of qualified immunity from the claims asserted against them in their individual capacities.

The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual,

---

[48]*See* Amended Complaint, at Count One and Count Two.  Plaintiff's amended complaint asserts two separate causes of action:  one entitled "First Amendment Retaliation/ Free Speech" (Count One), and one entitled "First Amendment Retaliation/ Freedom to Assemble" (Count Two). After a close reading of plaintiff's amended complaint, as well as her brief in opposition to summary judgment, the court concludes that plaintiff did not intend to assert separate violations of her rights to free speech and assembly, in addition to her First Amendment retaliation claims. Instead, plaintiff is asserting a claim for First Amendment retaliation that has two aspects:  a violation of free speech and a violation of the right to freely assemble.  Stated differently, plaintiff asserts that defendants retaliated against her for exercising her First Amendment rights by terminating her privileges to attend the Senior Center, and that defendants' retaliatory actions deprived her of both her right to freedom of speech and her right to freedom of assembly.  *See* Amended Complaint, at ¶ 15 ("The official decision caused the Plaintiff to be deprived entry into and upon the premises of the Rogersville Senior Citizen Center and deprived her right to freely communicate with its staff and members.  The official decision of the Defendants to prevent and expel the Plaintiff from the Senior Citizen Center deprived her of he[r] constitutional right to free speech and to assemble."). *See also* doc. no. 48 (plaintiff's brief), at unnumbered page 12 ("The regulation not only deprived the Plaintiff of her First Amendment rights to Free Speech, but deprived her of the First Amendment right to assemble.").

capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts apply a two-part test for evaluating whether a defendant is entitled to qualified immunity.[49] The "threshold question" that must be asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If the threshold question is answered affirmatively, the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.,* "whether the right was clearly established." *Id.*[50]

## A.    Violation of First Amendment

To succeed on her claim for retaliation in violation of the First Amendment, plaintiff must demonstrate: (1) that her speech was constitutionally protected; (2) that defendants' conduct adversely affected the protected speech; and (3) that there is a

---

[49]The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*. *See Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It is now within this court's discretion, in appropriate cases, to assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id.* That said, the tested sequence of analysis of *Saucier* will be followed under the circumstances of the present case.

[50]The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, plaintiff does not dispute that any of the individual defendants were acting within their discretionary authority at the time of the events that form the basis of this lawsuit.

causal connection between the defendants' actions and the adverse effect on plaintiff's speech.  *Bennett v. Hendrix,* 423 F.3d 1247, 1250 (11th Cir. 2005) (citations omitted).  The only element that seems to be in dispute is whether plaintiff engaged in constitutionally protected speech.[51]  Furthermore, plaintiff appears to have abandoned any claim that she engaged in any protected speech other than bringing sex-related jokes and emails into the Senior Center.[52]

---

[51]Neither plaintiff nor defendants addressed any of the other elements.  It is clear, however, that if plaintiff did in fact engage in protected speech when she complained about the leadership of the Senior Center and brought sex-based jokes and pictures into the Senior Center, then defendants' allegedly retaliatory conduct (banning plaintiff from using the Senior Center) would adversely affect plaintiff's ability to engage in that speech.

[52]Plaintiff's amended complaint also contained an allegation that she "spoke out about matters of public concern when she voiced her concern about the staff and the functions at the Center."  Amended Complaint, at ¶ 28.  In her brief, however, plaintiff focuses solely on her jokes and emails as protected speech.  *See, e.g.,* doc. no. 48 (plaintiff's brief), at unnumbered page 12 ("The Defendant's decision to expel the Plaintiff and to restrict her right to communicate with others was based on the printed material . . . and clearly an infringement on Plaintiff's First Amendment rights.").  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.,* *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal

The determination of whether plaintiff's sharing of sex-related jokes and emails constitutes protected speech turns on two other, preliminary determinations: *i.e.,* the type of forum in which the speech was presented, and whether the speech constitutes obscenity, which is not protected by the First Amendment.

### 1.    Forum analysis

As the Supreme Court explained in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37 (1983), "[t]he existence of a right of access to public property [for expressive purposes] and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44.

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954, 963, 83 L. Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey v. Brown*, 447 U.S. 455, 461, 100 S. Ct. 2286, 2290, 65 L. Ed.2d 263 (1980). The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of

quotation marks omitted).

communication. *United States Postal Service v. Council of Greenburgh*, 453 U.S. 114, 132, 101 S. Ct. 2676, 2686, 69 L. Ed.2d 517 (1981); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535-536, 100 S. Ct. 2326, 2332, 65 L. Ed.2d 319 (1980); *Grayned v. City of Rockford, supra*, 408 U.S., at 115, 92 S. Ct., at 2302; *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); *Schneider v. State of New Jersey*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939).

A second category consists of public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed.2d 440 (1981) (university meeting facilities); *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n*, 429 U.S. 167, 97 S. Ct. 421, 50 L. Ed.2d 376 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed.2d 448 (1975) (municipal theater). Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar v. Vincent, supra*, 454 U.S., at 269-270, 102 S. Ct., at 279.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Ass'n, supra*, 453 U.S., at 129, 101 S. Ct., at 2684. In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Id.*, 453 U.S., at 131, n. 7, 101 S. Ct., at 2686, n. 7. As we have stated on several occasions, "the

> State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.*, 453 U.S., at 129, 101 S. Ct., at 2684; *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 1216, 47 L. Ed.2d 505 (1976); *Adderley v. Florida*, 385 U.S. 39, 48, 87 S. Ct. 242, 247, 17 L. Ed.2d 149 (1966).

*Perry Education Association,* 460 U.S. at 45-46 (footnote omitted).

Plaintiff argues that the Senior Center is either a traditional public forum or a designated (or limited) public forum, and that defendants therefore could not place any content-based restrictions on her speech absent a compelling government interest.

The court does not agree with plaintiff's characterization. While it is true that the Senior Center is a place for senior citizens to assemble, that assembly is not primarily for the purpose of debate or the expression of ideas. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 800 (1985) (stating that the "principal purpose" of a traditional public forum is "the free exchange of ideas"). Instead, the testimony of record reflects that the primary purpose of the Senior Center is to provide senior citizens with entertainment, socialization, and meals. That type of assembly is not equivalent to the "quintessential public forum." *See Arkansas Educational Television Commission v. Forbes,* 523 U.S. 666, 678 (1998) ("The Court has rejected the view that traditional public forum status extends beyond its historic confines.") (citation omitted).

The Senior Center also cannot be classified as a designated (or limited) public

forum.

> Designated public fora . . . are created by purposeful governmental action. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." [*Cornelius,*] 473 U.S. at 802, 105 S. Ct. at 3449; *accord*, *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S. Ct. 2701, 2705, 120 L. Ed. 2d 541 (1992) (*ISKCON*) (designated public forum is "property that the State has opened for expressive activity by part or all of the public"). Hence "the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S., at 802, 105 S. Ct., at 3449.

*Forbes,* 523 U.S. at 677 (bracketed alteration in original). Thus, courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent," nor will they "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 803 (1985). Instead, there must be proof that the government "*intend*[*ed*] to make the property 'generally available' . . . to a class of speakers." *Forbes,* 523 U.S. at 678 (quoting *Widmar v. Vincent,* 454 U.S. 263, 264 (1981)) (emphasis supplied). "A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Forbes,* 523 U.S. at 679.

Here, there is no evidence that the Town of Rogersville or any of its officials had any intent to open up the Senior Center to the general public, or even to a class of speakers, as a forum for public expression of ideas or thoughts. The Town did not invite speakers to address the Center's patrons, and it did not open the Center to use by outside groups. While the Center's services are available for a limited class of people (senior citizens), the primary purpose of that limited availability is the provision of food, entertainment, and socialization, not the provision of a forum for public expression.

Plaintiff has cited no case holding that a Senior Center, or any similar organization, should be considered even a designated (or limited) public forum. Through its own research, the court has located only one case addressing the forum classification of a public senior citizens' center. In *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273 (10th Cir. 1996), the Tenth Circuit held that a local senior center was a designated (or limited) public forum. *Id.* at 1278. That holding is not dispositive to the current case, however, because *Church on the Rock* is clearly distinguishable. In *Church on the Rock,* the Tenth Circuit described the operations of the City of Albuquerque's Senior Centers as follows:

> The City owns and operates six Senior Centers. The centers are multipurpose facilities that provide forums for lectures, classes, movies, crafts, bingo, dancing, physical exercise, and other activities. To become

a member of a Senior Center, one need only fill out an application. The sole requirement for membership is that a person be at least fifty-five years old or be married to a member who is at least fifty-five years old. People who use the Senior Centers do not reside there, and all of the programs are voluntary.

Many of the programs at the Senior Centers are organized and sponsored by private individuals or organizations. Senior Center policies permit non-member groups to use the centers for classes and other activities if the subject matter is "of interest to senior citizens." Alternatively, groups may use the Senior Centers without regard to this subject matter requirement if they are composed of seventy-five percent or more senior citizens. Nonmembers or persons under fifty-five years of age may conduct classes, and people who deliver lectures or teach classes are also permitted to distribute literature.

The range of subjects that qualify as being "of interest to senior citizens" is quite broad. The Senior Centers' activities catalogs list many of the programs that meet this requirement, such as Amateur Radio, Ceramics, Chinese, Choral Group, Economics, El Abuelo-The Clown of Spanish Culture, Fishing, Medicare/Health Insurance Counseling, Myth of the Hanging Tree, and Plants and People of New Mexico. The catalogs also include a number of classes and presentations in which religion or religious matters are the primary focus: Bible as Literature, Myths and Stories About the Millennium, Theosophy, and A Passover Commemoration (an oratorio). The catalogs encourage "ideas for new classes and programs" as well.

*Church on the Rock,* 84 F.3d at 1276-77. In 1994, a pastor of the Church on the Rock (who was over fifty-five years of age) requested permission to show a two-hour film called *Jesus.* The film depicted the life of Jesus Christ, and it ended with affirming statements such as "Jesus is exactly who he claimed to be — the Son of the Lord, the Savior of all mankind," as well as with an invitation to adopt the Christian faith. *Id.*

at 1277. The City denied the pastor's request, citing reasons that are not material to this discussion, and the Church sued for free speech violations. *Id.* Before determining whether the Church's free speech rights had been violated, the Tenth Circuit also decided that the Senior Center was a designated public forum. To support that decision, the Court stated:

> [The Senior Center] may not be classified as a traditional public forum because it is not a traditional location of public debate or assembly. It is, however, a place that has been opened to the public for discussive purposes. The City has permitted lectures and classes on a broad range of subjects by both members and non-members at its Senior Centers. The City limits this designated public forum in two ways. First, the City imposes an age requirement for participation, although this limitation is rather flexible where groups or spouses are involved. Second, the City limits the subject matter of presentations to topics "of interest to senior citizens." The subject matter limitation has also been extremely flexible in practice, as evidenced by the long list of diverse topics that have been presented in the past.

*Id.* at 1278.

Here, in contrast, there is no evidence that the Town of Rogersville permits lectures, classes, or presentations of any type at the Senior Center, or that the Center has been "opened to the public for discussive purposes" in any other manner. Accordingly, *Church on the Rock* is distinguishable.

As there is no other authority to support plaintiff's position that the Town of Rogersville Senior Center was a traditional public forum or a designated (or limited)

public forum, the court must conclude that the Senior Center was a non-public forum. As such, the Town of Rogersville could regulate speech at the Center on the basis of content; could impose reasonable time, place, and manner restrictions; and could "reserve the forum for its intended purposes, communicative or otherwise," as long as any restrictions were reasonable and not based upon the viewpoint of the speaker. *Perry Education Association,* 460 U.S. at 46.

Plaintiff claims, rather summarily, that the restrictions placed on her speech were unreasonable and discriminated against her viewpoint. She states that "[t]he suppression of the Plaintiff's First Amendment rights were [sic] clearly because the public officials opposed the viewpoint of the jokes and restricting the Plaintiff's right to entry, utilization and assembly and communication with members of the center outside of the center was unreasonable and served no compelling state interest."[53] Later in her brief, plaintiff specifically refers to the language in Mayor Harold Chandler's January 11, 2008 letter prohibiting her "from entering in or upon the premises and grounds of the Senior Citizens Center in Rogersville and from any further communications with the operating staff and/or members of the Senior Citizens Center by any means, including, but not limited to, personal confrontation, telephone, email and U.S. Mail." Plaintiff asserts, without further explanation, that

---

[53]Doc. no. 48 (plaintiff's brief), at 11.

"[t]he regulation imposed [in this letter] was clearly not reasonable."[54]

First, the court cannot conclude that defendants discriminated against plaintiff's speech because of its viewpoint. Instead, a more accurate assessment would be that the restrictions defendants placed on plaintiff's speech were based upon the *content* or *subject matter* of the speech, not the particular *viewpoint* plaintiff was espousing. The distinction between *content discrimination* and *viewpoint discrimination* is fine, but essential, in the context of a non-public forum.

> Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. *Perry Education Assn., supra,* 460 U.S., at 49, 103 S. Ct., at 957. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, *see Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974), or if he is not a member of the class of speakers for whose especial benefit the forum was created, *see Perry Education Assn., supra,* the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Cornelius,* 473 U.S. 788, 806 (1985). *See also Perry Education Ass'n,* 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity.").

Here, defendants banned plaintiff from the Senior Center, a nonpublic forum, because she brought in sex-related jokes and emails that defendants found to be

_____

[54]*Id.* at 12.

objectionable "pornography." Without question, defendants restricted plaintiff's right to express herself freely. Even so, those restrictions were based on the *content* of plaintiff's speech, not on any particular *viewpoint*. Defendants restricted plaintiff's right to bring *all* sex-related material into the Senior Center. Defendants excluded an entire category of expressive material, not just a particular viewpoint. For example, plaintiff was not prohibited from espousing a pro-sex point of view while being allowed to espouse an anti-sex stance, and she was not allowed to speak about heterosexual acts while being restricted from speaking about homosexual acts. She was not even restricted as to the age groups her sexual jokes addressed. In other words, she was not allowed to speak about older people having sex while not being allowed to speak about younger people having sex. Defendants restricted plaintiff from bringing *any and all* sex-related jokes into the Senior Center.

Because defendants' restrictions of plaintiff's speech were not viewpoint-discriminatory, they did not violate the First Amendment, as long as they were reasonable in light of the purposes of the Senior Center. *See Perry Education Ass'n,* 460 U.S. at 49 ("The touchstone for evaluating [subject-matter-based restrictions on speech] is whether they are reasonable in light of the purpose which the forum at issue serves.") (footnote omitted).

The Government's decision to restrict access to a nonpublic forum need

-31-

> only be reasonable; it need not be the most reasonable or the only
> reasonable limitation.  In contrast to a public forum, a finding of strict
> incompatibility between the nature of the speech or the identity of the
> speaker and the functioning of the nonpublic forum is not mandated.

*Cornelius,* 473 U.S. at 808 (citations omitted).  Furthermore, "[t]he First Amendment

does not demand unrestricted access to a nonpublic forum merely because use of that

forum may be the most efficient means of delivering the speaker's message. . . .

Rarely will a nonpublic forum provide the only means of contact with a particular

audience." *Id.* at 809 (citations omitted).

Here, it has been established that the primary purpose of the Senior Center was

to provide senior citizens with meals, entertainment, and socialization.  Restricting

plaintiff's right to bring sex-related jokes and emails into the Senior Center was

reasonable in light of that purpose.  It was reasonable for the Senior Center to make

rules to control the behavior of the people who assembled there, because ensuring

orderly interaction among the Center's patrons would be essential to the operation of

the Center.

Defendants' restrictions did not stop at plaintiff's right to bring written material

into the Center, however.  Defendants also prohibited plaintiff "from any further

communications with the operating staff and/or members of the Senior Citizens Center

by any means, including, but not limited to, personal confrontation, telephone, email

-32-

and U.S. Mail." Construed in the light most favorable to plaintiff, this language prohibited plaintiff from contacting *any* staff member or patron of the Senior Center for *any* reason, at *any* time or in *any* place, even *outside* the Senior Center. Restricting plaintiff's right to associate with people *outside* the Senior Center — even if through personal telephone, mail, or electronic mail — has nothing to do with defendants' right or ability to control the behavior of patrons within the Center. Furthermore, that restriction left plaintiff with few "alternative channels" for communicating her ideas. *Cf. Cornelius,* 473 U.S. at 809 (holding that restrictions on speech in a nonpublic forum were reasonable, in part, because the speakers had "access to alternative channels, including direct mail and in-person solicitation outside the workplace" for expressing their ideas"); *Perry Education Ass'n,* 460 U.S. at 53-54 (restrictions on speech were reasonable when "substantial alternative channels," ranging from "bulletin boards to meeting facilities to the United States mail," were available).

> Defendants argue that plaintiff still could express her views

> to individuals or groups assembled at a grocery store, a gas station, a
> clothing store, the post office, a church, a restaurant, a park, a theater, a
> library, a bookstore, a bank, at her home, at a friend's home, at the
> doctor's office, at a nursing home, at the hospital, on the streets of the
> town, at a club meeting, etc.[55]

That argument, however, is not supported by the record. Construing the evidence in

---

[55]Doc. no. 50 (defendants' reply brief), at 6.

the light most favorable to plaintiff, defendants prohibited her from speaking to or associating with any member of the Senior Center, regardless of the location.[56]

Based on the foregoing, the court concludes that, while the restrictions defendants placed on plaintiff's speech were not viewpiont-discriminatory, those restrictions were not reasonable in light of the intended purpose of the forum.

## 2.   Obscenity

Defendants argue that plaintiff's speech nonetheless was unprotected by the First Amendment because it was obscene.  It is well-established that "obscene material is unprotected by the First Amendment."  *Miller v. California,* 413 U.S. 15, 23 (1973). In determining whether certain material is obscene,

> [t]he basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois*

---

[56]Defendants claim that they

"in no way prohibited her from expressing her point of view, or even disseminating obscene/ indecent material, through alternative media such as by way of the mail, a telephone, a fax machine, through e-mail, through social networking websites, by hanging posters around town, by writing letters to the editor, by broadcasting on the radio, by broadcasting on the television, etc."

Doc. no. 50 (defendants' reply brief), at 7.  They also argue that they "in no way punished [plaintiff] because of her membership in any association or prohibited her from associated [sic] or assembling with individuals who attended the Senor Citizens' Center at any location other than at the Senior Citizens' Center."  *Id.*  In light of the clear statement in Chandler's January 11, 2008 letter that plaintiff was prohibited "from any further communications with the operating staff and/or members of the Senior Citizens Center by any means, including, but not limited to, personal confrontation, telephone, email and U.S. Mail," defendants' argument is just plain wrong.

*v. Wisconsin,* [408 U.S. 229, 230 (1972)], quoting *Roth v. United States,* [354 U.S. 476, 489 (1973)]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller,* 413 U.S. at 25. In *Miller,* the Supreme Court offered the following "plain examples" of "obscene" speech that could be regulated by the government: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated[, and] (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.*

Defendants claim that the material plaintiff brought into the Senior Center was obscene because it is consistent with the two "plain examples" of obscenity discussed in *Miller.* Specifically, defendants assert that one of plaintiff's jokes described an "excretory function" because it referred to a group of men "kick[ing] the [excrement] out of a doctor. They also assert that one of plaintiff's jokes described an "ultimate sexual act" because it contained the used the four-letter "f-word" that rhymes with "duck." Finally, defendants claim that other jokes contained "patently offensive representation or descriptions of masturbation" and "lewd exhibition of the genitals" because they "depicted an elderly man copulating/masturbating with a computer, a man wearing a costume of a lewd exhibition of a man's genitals, and elderly men with

erections."[57]  Despite defendants' suggestion, however, not every depiction of a sex act, display of human genitals, or mention of an excretory function constitutes obscenity, unless there is evidence that the material is "patently offensive."

Here, there is only scant evidence regarding how the material plaintiff brought into the Center was viewed by others in the community.  The former Director of the Center and four members of the Town Council and Senior Citizens Committee testified either that they personally found the material to be "pornographic" or "offensive," or that other patrons of the Senior Center found it to be so.  Additionally, nineteen patrons of the Senior Center signed a petition stating that they were offended by the material.  However, those opinions do not establish the feelings of the community as a whole about the  material plaintiff brought into the Center.  Even if it did, there is no evidence, or even any argument, as to whether the material "appeals to the prurient interest," no discussion of the effect of state law, and no evidence or argument on the topic of whether the material lacks "serious literary, artistic, political, or scientific value."

In summary, based upon the evidence of record, the court concludes there are genuine issues of material fact as to whether the material plaintiff brought into the Center was "obscene" and, therefore, not entitled to constitutional protection.

---

[57]Doc. no. 44 (defendants' brief), at 15.

Therefore, genuine issues of fact exist as to whether plaintiff engaged in constitutionally protected speech.  Because the other elements of a free speech retaliation claim are undisputed, the court finds that plaintiff has stated and supported a viable claim for retaliation under the First Amendment.  *See Bennett,* 423 F.3d at 1250 (stating that the elements of a First Amendment retaliation claim include (1) that plaintiff's speech was constitutionally protected; (2) that defendants' retaliatory conduct adversely affected the protected speech; and (3) that there is a causal connection between the defendants' retaliatory actions and the adverse effect on plaintiff's speech).

**B.     Clearly Established Law**

Because plaintiff has asserted a viable claim for violation of her First Amendment rights, her claim against the Town of Rogersville will survive summary judgment.  The viability of plaintiff's claims against the individual defendants depends upon whether the First Amendment rights violated by those defendants were clearly established at the time of the violation.

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'"  *Williams v. Consolidated City of Jacksonville,* 341

F.3d 1261, 1270 (11th Cir. 2003) (bracketed alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).   The Supreme Court has rejected this Circuit's requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff.  *Hope*, 536 U.S. at 739.  Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope,* 536 U.S. at 741 (bracketed alterations in original).

An officer can receive "fair notice" of his or her unlawful conduct in various ways.

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.*  This kind of case is one kind of "obvious clarity" case.  For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

> Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.*  When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law

applicable in the future to different sets of detailed facts.  *See Marsh* [*v. Butler County, Ala.*]*,* 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001].  For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation.  These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances.  These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions.  But for judge-made law, there is a presumption against wide principles of law.  And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.*  That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances."  We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original).

The court concludes that the individual defendants here had fair warning that

their conduct would violate plaintiff's First Amendment rights. The individual defendants should have known, based upon the basic principles of First Amendment case law, that forbidding plaintiff to communicate with any member of the Center by any means, even outside the confines of the Center, was unreasonably restrictive and unrelated to their ability to legitimately regulate the behavior of the Center's patrons. *See Perry Education Ass'n,* 460 U.S. at 49. They also should have known that an expression of disapproval by a limited portion of the local population was not enough to satisfy the inquiry mandated *Miller v. California* for assessing obscenity, especially in the absence of any evidence of the social value of the material, its appeal to the prurient interest, or its status under state law. *See Miller,* 413 U.S. at 25.

Because the individual defendants had fair warning that their actions would violation plaintiff's First Amendment rights, they are not entitled to the protection of qualified immunity from plaintiff's claims for First Amendment retaliation.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, genuine issues of material fact exist to prevent the entry of summary judgment as to the claims asserted in plaintiff's amended complaint. Accordingly, defendants' motion for summary judgment is DENIED. This case will be set for pre-trial conference and trial by separate order.

DONE and ORDERED this 23rd of March, 2010.

_____
United States District Judge